RUNDELL v. LA CAMPAGNIE GÉNÉRALE TRANSATLANTIQUE.

(Circuit Court of Appeals, Seventh Circuit. March 22, 1900.)

No. 613.

1. TORTS—LAW APPLICABLE—PLACE OF INJURY.

The locus of a tort is determined by the place where the injury and damage arose, rather than where the negligent act which produced such injury was committed; and a libel to recover damages for the death by drowning of libelant's intestate, as the result of a collision and the sinking upon the high seas of a vessel sailing under the French flag, and on which the deceased was a passenger, alleged to have been due to negligent navigation, which does not allege that the drowning occurred upon the vessel, fails to show that the cause of action arose upon French territory, so as to render the law of France applicable thereto, conceding that the carrying of the French flag extended the jurisdiction of such law to the ship.

2. ADMIRALTY—TORTS COMMITTED ON THE HIGH SEAS—ACTION FOR WRONGFUL DEATH.

A suit in admiralty cannot be maintained in a court of the United States, either under the general maritime law or any act of congress, to recover damages for the death of a person on the high seas which was caused by negligence.

3. SAME—LAW GOVERNING—ENFORCING LAWS OF FOREIGN NATION.

In cases arising in tort upon the high seas, a court of admiralty of the United States cannot enforce the local law of a foreign nation, even if in terms it applies to the case, on the ground that the alleged cause of action arose upon a vessel of that nation, but such cases must be adjudged by the general maritime and admiralty law as understood and administered by such courts.

Appeal from the District Court of the United States for the Northern District of Illinois.

Charles A. Munroe, for appellant.

Gilbert E. Porter, for appellee.

Before WOODS, Circuit Judge, and BUNN and ALLEN, District Judges.

BUNN, District Judge. This is an appeal from a decree in admiralty dismissing a libel in personam for want of equity. 94 Fed. 366. The appellant, as administrator of the estate of Edwin R. Rundell, deceased, filed his bill in the district court to recover damages for the death of the deceased, for the use and benefit of a minor son. The libel sets forth that on July 2, 1898, Edwin R. Rundell, residing at Chicago, became a passenger on board the steamship La Bourgogne, being one of appellee's steamships, at the port of New York, and bound for the port of Havre, in France; that the ship set sail from New York on the 2d day of July, and so continued upon her voyage in the Atlantic Ocean until the 4th day of July, when it collided with a ship called the Cromartyshire, an English sailing vessel, and in the collision was sunk and wholly lost, and Rundell was killed by being drowned, wholly through the fault and improper navigation of the steamship by its officers and crew; that said steamship was upon said voyage being operated by the appellee, a corporation organized under the laws of France and a citizen of that country; that said steamship was sunk upon the high seas, in the Atlantic

Ocean, about 60 miles south of Sable Island, beyond the territorial jurisdiction of any nation, but was at the time flying the French flag. The libel further avers that certain sections of the statute law of France, which are set forth in hæc verba, gave a legal representative a right of action for the death of his intestate occurring through the negligence of another; and that by the decisions of some of the courts of France (which are not identified or set forth) said statute law is held to extend to and operate upon all persons, whether citizens or aliens, upon the high seas, in vessels flying the French flag; and that under those statutes and decisions a right of action for the death of said deceased, enforceable in the district court, arose and exists in favor of the libelant; and prays judgment for the sum of $50,000. Appellee, the defendant in the libel, filed exceptions to the libel, alleging points of insufficiency in substance as follows:

"First. The libel does not present or disclose any right of action in libelant against this defendant enforceable by said court in the exercise of its admiralty jurisdiction. Second. The libel is insufficient in law to enable libelant to recover from defendant in this cause, in this: that it is brought solely to recover damages for the death of Edwin R. Rundell, which is alleged to have occurred upon the high seas by reason of the negligence of the defendant, also occurring upon the high seas, when, as a matter of law, no right of action exists and no action can be maintained in a court of admiralty of the United States to recover damages for death by negligence occurring upon the high seas. Third. The libel is insufficient, because it is brought solely to recover for death by negligence occurring on the high seas, and under the general maritime law as interpreted and enforced by the courts of the United States, which alone governs the case, no right of action arises or can be maintained in this court for death so occurring."

Other exceptions relating to the insufficiency of the libel in pleading the law of France it is not necessary here to set out.

We think there are two very substantial grounds upon which the decree of the district court should be sustained. The first is that it does not appear from the libel that the death of the deceased occurred upon the steamship La Bourgogne, the averments being merely that he lost his life by drowning, as a result of a collision and consequent sinking of the vessel; second, that in cases arising in tort upon the high seas the United States district court, sitting in admiralty, cannot enforce the local law of France, even if in terms it applied to the case, which does not appear, but that such cases must be adjudged and governed by the general maritime and admiralty law as understood and administered by the United States courts.

As stated, there is no allegation that the deceased was drowned while upon the appellee's ship, and there can be no implication to that effect. The implication is rather the other way, as the pleading must be construed most strongly against the pleader. The acts of negligence which caused the sinking of the vessel were committed upon the vessel, but these would be damnum absque injuria, unless it also appear that the drowning of the deceased, which constitutes the real damage and injury, was also upon the vessel. The drowning would not be in any sense under the French flag, unless it was upon the sinking vessel. It will not be claimed that the jurisdiction of the flag extended upon the high seas beyond the limits of the ship flying it. To make the local law of France, therefore, of any possible

application, it should appear by clear averment that the drowning took place upon the steamship. The libel nowhere states that the deceased came to his death while upon the Bourgogne. The averments are merely that he lost his life by drowning as a result of a collision and sinking of the vessel. The plain implication, therefore, is that he was drowned upon the high seas, apart from the vessel. At least, there is nothing to show to the contrary. The locus of the tort, therefore, which must always be determined by the place where the injury and damage arise, rather than where the negligent act is committed, must be considered as being upon the high seas, rather than upon French territory, supposing that the flying of the French flag made the vessel French territory while upon the high seas, as is claimed. The place where the death occurred and the damage arose must be held to be the locus in quo. The damage is the substance and consummation of the injury, and from that alone springs the right of recovery. The Plymouth, 3 Wall. 20, 18 L. Ed. 125; Leonard v. Decker (D. C.) 22 Fed. 741; The City of Lincoln (D. C.) 25 Fed. 835; City of Milwaukee v. Curtis (D. C.) 37 Fed. 705; The H. S. Pickands (D. C.) 42 Fed. 239; The Mary Garrett (D. C.) 63 Fed. 1009; Hermann v. Mill Co. (D. C.) 69 Fed. 646.

In the case of The Plymouth, supra, opinion by Mr. Justice Nelson, it was held that, where the damage done is wholly upon land, the fact that the cause of the damage originated on water subject to the admiralty jurisdiction does not make the cause one for the admiralty. So that where a vessel lying at a wharf, on waters subject to admiralty jurisdiction, took fire, and the fire, spreading itself to certain storehouses on the wharf, consumed these and their stores, it was held not to be a case for admiralty proceeding. The court in the opinion used this language:

"We can give, therefore, no particular weight or influence to the consideration that the injury in the present case originated from the negligence of the servants of the respondents on board a vessel, except as evidence that it originated on navigable water [the Chicago river]; and, as we have seen, the simple fact that it originated there, but, the whole damage done upon the land, the cause of action not being complete on navigable waters, affords no ground for the exercise of the admiralty jurisdiction. The negligence, of itself, furnishes no cause of action; it is damnum absque injuria. The case is not distinguishable from that of a person standing on a vessel or other support in the river, and sending a rocket or torpedo into the city, by means of which buildings were set on fire and destroyed. That would be a direct act of trespass, but quite as efficient a cause of damage as if the fire had proceeded from negligence. Could the admiralty take jurisdiction? We suppose the strongest advocate for this jurisdiction would hardly contend for it. Yet the origin of the trespass is upon navigable waters, which are within its cognizance. The answer is, as already given: The whole or at least the substantial cause of action, arising out of the wrong, must be complete within the locality upon which the jurisdiction depends,—on the high seas or navigable waters."

Leonard v. Decker (D. C.) 22 Fed. 741, arising in the Southern district of New York, was a case in admiralty for tort, where the defendants, as lessees of a wharf, negligently permitted certain bolts to project from the wharf under water, whereby injury was caused to libelant's vessels mooring there. It was contended that, as the locality of the negligence was on land, the case was not of

admiralty cognizance. But the court held that the place where the injury is consummated and the damage actually received is regarded as the locus of the tort, and in the opinion by Judge Brown, after citing many cases, the court says:

"In all the above cases the decision is made to turn, not upon the place where the negligence as the cause of the damage originates, but upon the place where the injury is received and consummated. It must appear that the damage, as the substantial cause of action, arising out of the negligence, is complete within the locality upon which the jurisdiction depends, namely, upon the high seas or navigable waters. The Plymouth, 3 Wall. 36, 18 L. Ed. 125. The canal boats in this case were moored alongside the wharf for the purpose of discharging their cargoes,—a work which is maritime, and one of the necessary incidents of navigation,—and the vessels were afloat upon navigable waters. The whole damage and injury were received by them in this situation. The locus of the damage was upon navigable waters. That was therefore the locus of the tort, and, as that tort was upon the water, it was within the admiralty jurisdiction, and the libelants are accordingly entitled to decree, with costs."

The City of Lincoln (D. C.) 25 Fed. 835, by the same court, was a case where a wharf, which had been loaded with steel blooms, which had been discharged from the steamship City of Lincoln, gave way beneath the weight, throwing the blooms into the water. On suit brought against the steamship and the wharfinger, the latter denied the jurisdiction of the admiralty court, on the ground that the negligence alleged was a tort committed upon the wharf; that is, upon the land. The court held that, in cases where negligence and the injury occur in different places, the criterion is the place where the substance and the consummation of the injury are effected. And that, as the injury was caused wholly by the water into which the blooms were thrown, if the breaking down of the wharf occurred through the wharfinger's negligence, such negligence was a marine tort, of which a court of admiralty has jurisdiction. The like rule was followed by Judge Jenkins in The City of Milwaukee v. The Curtis (D. C.) 37 Fed. 705. The H. S. Pickands (D. C.) 42 Fed. 239, was a libel to recover for personal injuries received by libelant, who was engaged in repairing a vessel lying at the wharf. While standing on a ladder resting at one end on the wharf and the other against the vessel, the negligent act of the master caused the ladder to fall, whereby libelant was thrown upon the wharf and injured. Brown, J., held that a court of admiralty had no jurisdiction, saying:

"It has never been doubted since the case of The Plymouth, 3 Wall. 20, 18 L. Ed. 125, that to enable us to take cognizance of the maritime tort the injury must have been consummated and the damage received upon the water. The mere fact that the wrongful act was done upon a ship is insufficient. Subsequent adjudications have in no wise tended to limit or qualify this rule."

So, in The Mary Garrett (D. C.) 63 Fed. 1009, it was held that admiralty has no jurisdiction of an action for injury to a person on a wharf caused by negligence originating on a ship, and it made no difference that the person was employed as, a seaman on the same ship. And in the opinion by Judge Morrow the court says:

"Nor does it make any difference whether the tort had its' inception, its origin, upon water, if the consequential effects of the wrong—the consumma-

tion of the tort—happened on land.  It is immaterial, so far as the admiralty jurisdiction is concerned, that the tort originated on water if the injury happened on land."

And in a similar case, that of Hermann v. Mill Co. (D. C.) 69 Fed. 646, the same judge, after reviewing the cases, arrived at the following conclusion:

"I think that the only true and rational solution of the jurisdictional question, where the tort occurs partly on land and partly on water, is to ascertain the place of the consummation and substance of the injury.  This latter element of the wrong is necessarily the only substantial cause of action; otherwise, it would be damnum absque injuria.  * * *  The central idea running through all these cases is, so far as jurisdiction over torts is concerned, that the admiralty law looks to the place where the injury was suffered, and not to the locality of the agent causing the injury."

We think these cases abundant to show that if deceased came to his death, not in the vessel, but on the high seas outside the vessel, the local law of France, which it is only claimed extends to the vessel flying the French flag, can have no application to the case.

2. In regard to the second exception, that the libel is insufficient in law to enable the libelant to recover damages in an action of tort for the death of the deceased occurring upon the high seas by reason of the negligence of the defendant, because the general maritime law, by which the admiralty court in this country is governed, allows of no recovery in such a case, we are of opinion that this exception was well taken, and that the decision of the district court was correct.  See the opinion of the court below in 94 Fed. 366. The question is a very interesting one, and has never, so far as we can learn, been directly and in terms decided by our supreme court. We have examined it, however, with some care, and this is the conclusion we have reached.  It is well settled that neither by the common law, nor by the general maritime law, nor by any law of congress will an action lie for death by a wrongful act.  No such action can be sustained under any such law in the courts of the United States.  Insurance Co. v. Brame, 95 U. S. 756, 24 L. Ed. 580; The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, 30 L. Ed. 358;  The Alaska, 130 U. S. 201, 9 Sup. Ct. 461, 32 L. Ed. 923;  Butler v. Steamship Co., 130 U. S. 527, 9 Sup. Ct. 612, 32 L. Ed. 1017.  The same rule prevailed in England under the common law until the passage of Lord Campbell's act.  The effect of the common law was so recited in that act.  In The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, 30 L. Ed. 358, the supreme court held that in the absence of an act of congress, or a statute of a state giving a right of action therefor, a suit in admiralty cannot be maintained in the courts of the United States to recover damages for the death of a human being on the high seas, or on waters navigable from the seas, which is caused by negligence.  That decision is perhaps in terms broad enough to cover the case at bar, except that the precise question here was not in that case, because it is certain and conceded that there is no law of congress nor of a state that professes to give the right, and by the general maritime law no such right ever existed. In The Alaska, 130 U. S. 201, 9 Sup. Ct. 461, 32 L. Ed. 923, this decision was affirmed, and the same doctrine adhered to.  In that

case it was conceded by counsel, and concurred in by the court, that the statute of New York on the subject of actions for death by negligence did not apply to that case, because the deaths did not occur within the state of New York, or in waters subject to its jurisdiction, but upon the high seas. If the federal court could not enforce the law of New York in such a case, it is difficult to see how it can enforce a law strictly foreign and local; for it must be conceded that the French law, allowing it to be all that is claimed for it, can only have operation within the territory and jurisdiction of France. The law of France can have no extraterritorial force. It is not within the jurisdiction of the legislative power of any one nation to make the maritime law for the whole world, so far as the courts of other countries are concerned. It can only make laws to be operative within its own territory and jurisdiction. It may undoubtedly make laws to bind its own subjects while abroad, if they should ever return, to be adjudged in the courts of their own country, but this right is not one that will always be respected by the courts of other countries. Story, Confl. Laws, §§ 21, 22; The Apollon, 9 Wheat. 362, 6 L. Ed. 111; The Scotland, 105 U. S. 24, 26 L. Ed. 1001; The E. B. Ward (C. C.) 16 Fed. 255; Carlson v. Association (D. C.) 93 Fed. 468; Armstrong v. Beadle, 5 Sawy. 484, Fed. Cas. No. 541. Mr. Justice Story, in his Conflict of Laws (section 22), says:

"Without entering upon this subject (which properly belongs to a general treatise upon public law), it may be truly said that no nation is bound to respect the laws of another nation made in regard to the subjects of the latter which are nonresidents. The obligatory force of such laws of any nation cannot extend beyond its own territories. * * * Whatever may be the intrinsic or obligatory force of such laws upon such persons, if they should return to their native country, they can have none in other nations wherein they reside. Such laws may give rise to personal relations between the sovereign and subjects, to be enforced in his own domains; but they do not rightfully extend to other nations. * * * A state has just as much intrinsic right, and no more, to give to its own laws an extraterritorial force as to the property of its subjects situated abroad as it has in relation to the persons of its subjects domiciled abroad. That is, as sovereign laws, they have no obligation on either the person or the property. When, therefore, we speak of the right of a state to bind its own native subjects everywhere, we speak only of its own claim and exercise of sovereignty over them when they return within its own territorial jurisdiction, and not of its right to compel or require obedience to such laws on the part of other nations within their own territorial sovereignty."

The supreme court in The Scotland, 105 U. S. 24, 26 L. Ed. 1001, say:

"So far as they stand on general grounds of argument (certain English cases), the most important consideration seems to be this: That the British legislature cannot be supposed to have intended to prescribe regulations to bind the subjects of foreign states, or to make for them a law of the high sea, and, if it had so intended, could not have done it. This is very true. No nation has any such right. Each nation, however, may declare what it will accept, and by its courts enforce, as the law of the sea, when parties choose to resort to its forum for redress. And no persons subject to its jurisdiction or seeking justice in its courts can complain of the determination of their rights by that law, unless they can propound some other law by which they ought to be judged; and this they cannot do, except where both parties belong to the same foreign nation, in which case it is true they may well claim

to have their controversy settled by their own law.  *  *  *  But where they belong to the country in whose forum the litigation is instituted, or to different countries having different systems of law, the court will administer the maritime law as accepted and used by its own sovereignty."

Armstrong v. Beadle, 5 Sawy. 484, Fed. Cas. No. 541, was an action at law under the California statute to recover for death upon the high seas of a passenger on board an Oregon vessel.  Circuit Judge Sawyer, deciding upon the liability, in his opinion uses this language:

"The first point presented is that the statute has no extraterritorial 'operation, and is limited to accidents occurring within the territorial jurisdiction of the state, and as the death occurred upon the high seas, beyond the legislative jurisdiction of the state, the statute is inapplicable.  There was no liability at common law for the death of a party resulting under circumstances like those set out in the complaint, and, unless the statute in question gives the right of action, the plaintiff cannot recover.  The statute, undoubtedly, creates a new right of action, and does not merely give a remedy for a right already existing.  If it operates beyond the territorial jurisdiction of the state, then it becomes a universal law, applicable to all countries, and the legislature of California would be adopting a code of laws affecting the rights of parties arising out of acts done wholly in foreign countries as well as upon the high seas.  If California can pass laws of the kind, operating extraterritorially, then other states and countries can pass laws upon the same subject, operating upon the high seas, and these laws may be in conflict; but there is nothing in the statute to indicate that it was intended to operate beyond the limits of the state."

We think, also, that the evident tendency of the decisions and weight of authority is that cases of tort arising upon the high seas between parties of different nationalities will in the admiralty courts of the United States be governed by the law of the forum, which is the general maritime law as understood and administered in these courts.  The Scotland, 105 U. S. 24, 26 L. Ed. 1001; The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152; The Brantford City (D. C.) 29 Fed. 373.  In the case of The Scotland the supreme court decided that the courts of every country will administer justice according to its laws, unless a different law be shown to apply, and this rule applies to transactions taking place on the high seas.  If a collision occur on the high seas between two vessels, controversies arising therefrom will be governed in the courts of this country by our laws, unless the two colliding ships belong to the same foreign country, or perhaps to different countries using the same law, when they will be governed by the laws of the country to which they belong.  And in the opinion by Mr. Justice Bradley the following language, which seems quite applicable in principle to this case, is used:

"In administering justice between parties, it is essential to know by what law, or code, or system of laws their mutual rights are to be determined.  When they arise in a particular country or state, they are generally to be determined by the laws of that state.  Those laws pervade all transactions which take place where they prevail, and give them their color and legal effect.  Hence, if a collision should occur in British waters, at least between British ships, and the injured party should seek relief in our courts, we would administer justice according to the British law, so far as the rights and liabilities of the parties were concerned, provided it were shown what that law was.  If not shown, we would apply our own law to the case.  In the French

or Dutch tribunals they would do the same. But if a collision occurs on the high seas, where the law of no particular state has exclusive force, but all are equal, any forum called upon to settle the rights of the parties would prima facie determine them by its own law as presumptively expressing the rules of justice; but, if the contesting vessels belonged to the same foreign nation, the court would assume that they were subject to the law of their nation carried under their common flag, and would determine the controversy accordingly. If they belonged to different nations, having different laws, since it would be unjust to apply the laws of either to the exclusion of the other, the law of the forum—that is, the maritime law as received and practiced therein—would properly furnish the rule of decision. In all other cases, each nation will also administer justice according to its own laws. And it will do this without respect of persons, to the stranger as well as to the citizen."

In The Belgenland, supra, the supreme court affirmed a similar doctrine, and held that in a proceeding in admiralty against one foreign vessel for collision with another foreign vessel on the high seas, the general maritime law, as understood and administered in the courts of the country in which the litigation is prosecuted, is, in general, the law governing the case. We think upon principle these cases, though the facts are not the same, should determine the one at bar, and that the position taken by appellant's counsel as to the application of the local law of France to the case is quite irreconcilable with these decisions of our supreme court. If these decisions do not determine the case at bar, they indicate pretty clearly what the decision should be. We find no case where such a rule has ever been applied to an action arising in tort. In The Brantford City (D. C.) 29 Fed. 373, where the subject was ably treated by Mr. Justice Brown, of the Southern district of New York, in an opinion afterwards referred to with approval by the supreme court in Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788, the court states the rule very comprehensively in the following language:

"But inasmuch as the high seas are the common ground of all nations, and not governed by merely the municipal laws of either, the quality of acts committed on the high seas, as between persons or ships belonging to different nations whose laws are different, is determined by the maritime law as accepted and administered in the forum where the suit is prosecuted. The fact that in most of the cases cited the injury arose from collision is immaterial. The gravamen of the action is negligence. On that alone the action depends. It is negligence only that constitutes the tort. It is so in this case in its aspect as a tort, and as this negligence, resulting in damage to libelants, occurred partly within our jurisdiction and partly upon the high seas, the law applicable to the case, as one of tortious negligence, would seem, upon the above authorities, to be our own law, as the law of the forum."

Any other rule would be likely to lead to much conflict and uncertainty. Nor can the fiction in regard to the law of the flag, now mainly exploded, have any force to extend the effect of the laws of any country upon the high seas or beyond that country's own territory, as will be seen by the cases following. It is merely a phrase to denote a simple fact, namely, the law of the country to which the ship belongs, and has no effect to extend the jurisdiction or add to the force of those laws in cases of tort. Johnson v. Twenty-One Bales, 2 Paine, 601, Fed. Cas. No. 7,417; Thomassen v. Whitwell, 9 Ben. 403, 23 Fed. Cas. 1006. The decree of the district court is affirmed.